WILLIAM A. FREDA

*v.*

HATTIE BERGMAN, *alias* HATTIE FREDA.

[Submitted April 4th, 1910.    Decided May 13th, 1910.]

1. A suit to annul a marriage on the ground that defendant had at the time a former spouse, is not a suit merely to relieve the private grievance of complainant, but the state is also concerned, and the interests of innocent unborn children may also be involved.

2. The denial of a decree annulling a marriage, where its nullity has been absolutely established by the proof of a living spouse of one of the parties, does not establish the legality of the second marriage, but the party competent to marry may immediately marry another, and the other party may do likewise after his incapacity has been removed by the death or divorce of his spouse.

3. Where the proof in a suit to annul a marriage fails to show that the marriage is void, the decree should so recite and adjudge, and dismiss the bill on that ground.

4. A man marrying a woman having a former husband may sue to annul the marriage, though he was guilty of negligence in relying on her statements that she had been divorced from her former husband.

5. Where the nullity of a marriage has been established by clear and convincing evidence, a bar to an annulment thereof should also be established by clear and convincing evidence before a decree of nullity is denied.

---

On bill for decree of nullity of marriage. Heard on exceptions to master's report in favor of dismissal of bill.

*Mr. John P. Manning,* for the complainant.

STEVENSON, V. C.

In this *ex parte* case the learned master reports that the marriage in question was null and void, but further reports that the complainant is not entitled to a decree of nullity because he was cognizant of the prior marriage of the defendant, and that such marriage remained undissolved. It is perhaps not quite clear whether the master found, as a matter of fact, that the complainant had actual notice of the incapacity of the defendant, and believed that such incapacity existed, or was merely guilty of negligence in relying "wholly upon the statement of the defendant that she had been divorced from her husband," and in refraining from making "inquiries with reference to the time when or the circumstances under which the divorce had been obtained."

1. The doctrine which has the strong support of Vice-Chancellor Pitney, and which apparently must be regarded as one of the grounds upon which he rested his decision in the case of *Rooney* v. *Rooney, 54 N. J. Eq. (9 Dick.) 231, 245,* in my opinion should not be extended.

The *Rooney Case,* when confined to its facts, merely decides that when a married man induces a woman innocently to go through a form of marriage with him by falsely representing himself to be single, and cohabitation and pregnacy of the woman thereupon follow, he cannot come into a court of equity and relieve himself of his obligation to support his victim by obtaining a decree declaring his bigamous marriage void. The opinion of the learned vice-chancellor, however, deals with the whole subject of the policy of permitting a party who has been guilty of knowingly attempting a bigamous and therefore void marriage, to obtain a decree declaring the fact that such bigamous marriage was void *ab initio,* and the American decisions and the English decisions are exhibited as generally in conflict on this subject (at *p. 243*). See *1 Bish. Mar. D. & S. § 722; 2 Nels. Div. & Sep. § 590.*

The correctness of the narrow proposition established by the *Rooney Case,* or of the wider propositions upon which Vice-Chancellor Pitney cites and discusses authorities, seems to depend on the question whether this sort of a matrimonial cause in the

court of chancery of New Jersey is strictly of "an equitable nature and subject to the rules and maxims of courts of equity, rather than those of the English ecclesiastical courts." *Rooney Case p. 242.*

In the case of *Kretz* v. *Kretz, 73 N. J. Eq. (3 Buch.) 246,* Vice-Chancellor Leaming regards this question as still in doubt in this state, but declares himself in favor of the views expressed by Vice-Chancellor Pitney.

(1) The doubt in regard to this subject grows out of the unique character of all matrimonial cases involving either the existence or the continuance of the marriage state. In this class of cases, it is not the private grievance of the complainant alone which is considered, and which controls the nature and extent of the remedy, if any, which may be granted. The state is often called a "third party" to every suit for divorce or nullity of marriage. But not only the state is concerned, but the interests of innocent unborn children may be involved. If a decree of nullity is denied, where nullity has been absolutely established by the proofs, the legality of the marriage is not established. *Rooney* v. *Rooney, supra.* The fact that the marriage was null remains. One of the parties may immediately contract another alliance, and the other party may do likewise after his incapacity has been removed by the death or the divorce of his spouse. Questions of the utmost importance affecting innocent children relating to property and relating to status, may subsequently come up when the proof of the nullity of the marriage in question may be beyond reach.

It seems to me that it is a sound proposition, in point of ethics and public policy, that a person in the situation of this complainant should not contract a lawful marriage with anyone without giving such lawful spouse and her possible children, in every case where it is practicable, the protection of a decree declaring his prior attempted marriage void. There is also, I think, abundance of room to argue that a similar duty rests upon a bigamist who, after his void marriage, becomes capable of marrying again by the death of his spouse, and thereupon proposes to enter into a valid marriage with an innocent party. As long as a person is permitted by law to contract marriage, it is somewhat

difficult to see why all the safeguards possible should not be thrown around such lawful marriage which the law favors. With the outstanding record of the prior marriage, the officers, of the state having the prosecution of crime in charge might be embarrassed in determining whether or not there should be an indictment for bigamy.

It may be conceded most amply that if the sole effect of declining to make a decree which merely establishes a fact found to exist, is to punish a guilty party by exposing him to inconvenience, the general equitable rule requiring the complainant to appear with clean hands might be enforced to its full extent and in all its rigor. But the difficulty to my mind arises from the fact that the interests of the state and of possible innocent unborn children require that the status of the citizens of the state in respect to marriage should, as far as possible, be made certain and kept free from doubt. I cannot avoid grave doubts as to the soundness of any rule which permits a man to marry but undertakes to punish him by exposing his marriage to doubt and question, and his innocent wife and children to all the evil and injury which flow from such doubts.

(2) The complainant is not asking a court of equity to aid him in securing the proceeds of any crime or other wrong-doing on his part. There is a wide difference between large classes of cases where complainants are denied "relief" in a court of equity because they come into that court with unclean hands, and this unique decree which is rendered in a suit merely to establish the fact that a marriage was null and void *ab initio*. The complainant's benefit from this decree, as I have endeavored to suggest above, is oftentimes a negligible quantity compared with the benefit which innocent parties and the state may derive from such decree. The complainant is not asking for any property; he is merely asking for a judicial declaration of a fact to which the court cannot shut its eyes, and in the ascertainment of which great interests beyond those of the complainant may be involved.

(3) In many cases of the class under consideration the decree dismissing the bill of the complainant on the ground that he was either alone guilty or *particeps criminis* with the defendant, would seem to establish the nullity of the marriage. Following

4

the master's report the decree in this case would recite that the marriage was void, but that because the complainant knew it was void, the bill must be dismissed. The decree dismissing the bill therefore seems to be necessarily based upon a finding of the fact thus made *res adjudicata* between the parties that their marriage was null.

When a decree recites that the marriage was null and void, but because the complainant knew that it was null and void, he shall not have a judicial declaration to that effect, it would seem that the very result which the decree undertakes to avoid is secured on behalf of the complainant and all parties who may afterwards be concerned. It is true that the decree, by concealing the honest finding of fact which the court makes, may, in some cases, avoid this result. In all cases where the proofs fail to show that the marriage was void, the decree should so recite and adjudge, and dismiss the bill on that ground.

(4) If the complainant thought he was in form entering into a void marriage, contrary to the laws of the state, and contrary to public policy, when he files his bill to obtain a decree of nullity, may he not be deemed as coming into court repenting of his wrong-doing and asking to have his wrongful act, as far as possible, undone, so that all injurious effects in the future which might result from that wrongful act upon innocent parties and upon the state may be absolutely prevented? If the complainant was the bigamist in the transaction, he remains liable to an action at law for damages on behalf of the other party, if such party was an innocent victim. *19 Am. & Eng. Encycl. L. 1219 note 5; 2 Nels. Div. & Sep. § 1023.* By obtaining a decree that his fraudulent colorable marriage was void, he does not injure his innocent victim, but, on the contrary, aids his victim in recovering her damages.

My conclusion on this branch of the present case is that a decree of nullity cannot be withheld without extending the authority of the *Rooney Case* into a wide field where I may be obliged to follow, but am unable to lead.

2. The proofs fail to satisfy me that the complainant believed that the defendant was still the wife of the man whom she had formerly married. His positive testimony to the effect that the

defendant told him that she had been divorced and that he relied on such statement should probably be accepted, notwithstanding the testimony of the defendant's sister to the contrary. The bar to relief set up by the *Rooney Case,* whatever may be its exact scope, or by other American cases, must, I think, necessarily include guilt, bad faith, on the part of the complainant in entering into the bigamous marriage. No case which I have seen suggests that mere negligence resulting from foolish credulity is sufficient.

It is plain, also, I think, that after the nullity of the marriage has been established by the full measure of proof properly required any bar to a decree of the sort which has been herein considered, should also rest upon clear and convincing evidence.

The exceptions will be sustained and a decree of nullity advised.